1
2
3
4
5
6
7
8 **UNITED STATES DISTRICT COURT**
9 **SOUTHERN DISTRICT OF CALIFORNIA**
10

11  WILLIAM ALLEN GARRETT,                    Civil No.    14cv1572-BEN (PCL)
12                              Petitioner,    **REPORT AND RECOMMENDATION**
13                                             **OF UNITED STATES MAGISTRATE**
                                               **JUDGE RE:**
14               vs.
                                               **(1)  DENIAL OF MOTION FOR**
15                                             **EVIDENTIARY HEARING; and**
    DR. JEFFREY BEARD, Secretary,
16                                             **(2)  DENIAL OF PETITION FOR WRIT**
                                Respondent.    **OF HABEAS CORPUS**
17

18         This Report and Recommendation is submitted to United States District Judge Roger T.

19  Benitez pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States

20  District Court for the Southern District of California.

21                                    **I.**

22                        **FEDERAL PROCEEDINGS**

23         William Allen Garrett (hereinafter "Petitioner"), is a state prisoner proceeding pro se and

24  in forma pauperis with a Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (ECF

25  No. 1.)  Petitioner was convicted by a San Diego County Superior Court jury of burglary and

26  receiving stolen property, and the jury found that he had personally used a deadly and dangerous

27  weapon, a knife, during the burglary.  (Lodgment No. 2, Clerk's Tr. ["CT"] at 526-27.)  The trial

28  judge found that Petitioner had served four prior prison terms, that he had a prior serious felony

conviction which constituted a strike within the meaning of California's Three Strikes law, and sentenced him to 16 years in state prison, which the appellate court reduced by one year.  (CT 529-41.)  He alleges here, as he did in state court, that his federal constitutional rights were violated due to: (1) admission of statements he made after an invalid waiver of his constitutional rights; (2) admission of statements he made during custodial interrogation outside the presence of counsel after counsel had been appointed; (3) insufficient evidence that he used a knife during the burglary; (3) cumulative error; and (4) ineffective assistance of trial counsel.  (Pet. at 6-12.[1]) He has also filed a Motion for an evidentiary hearing.  (ECF No. 9.)

Respondent has filed an Answer ("Ans.), a Memorandum of Points and Authorities in support ("Ans. Mem."), and has lodged portions of the state court record.  (ECF Nos. 19-20.) Respondent contends that evidentiary development is not appropriate, and that habeas relief is not available because the state court adjudication of Petitioner's claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  (Ans. Mem. at 24-76.) Petitioner has filed a Traverse.  (ECF No. 26.)

For the following reasons, the Court finds that an evidentiary is neither necessary nor warranted, and that Petitioner is not entitled to federal habeas relief because the state court adjudication of his claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. Accordingly, the Court **RECOMMENDS** the Petition be **DENIED**.

## II.

## STATE PROCEEDINGS

In a four-count Information filed in the San Diego County Superior Court on August 19, 2011, Petitioner was charged with two counts of assault with a deadly weapon on a police officer in violation of California Penal Code section 245(c) (counts one and two); burglary in violation of Penal Code section 459 (count three); and receiving stolen property in violation of Penal Code section 496(a) (count four).  (CT 15-16.)  The Information included sentence enhancement

---

[1]  When citing to documents filed with the Court's Electronic Case Filing ("ECF") system, such as the Petition, Answer and Traverse, the Court will refer to the pages assigned by that system.

allegations that Petitioner personally used a deadly and dangerous weapon in the commission of counts one through three within the meaning of Penal Code sections 1192.7(c)(11)&(23) and 12022(b)(1).  (CT 16.)  The Information also alleged that Petitioner had served four prior prison terms, and had suffered a prior serious felony conviction which constituted a strike within the meaning of California's Three Strikes law.  (CT 17-19.)

On March 5, 2012, the jury found Petitioner guilty of burglary and receiving stolen property, and returned a true finding that he had personally used a deadly and dangerous weapon, a knife, during the burglary; he was found not guilty on the remaining counts.  (CT 518-27.)  On October 24, 2012, the trial judge found the prior conviction sentence enhancement allegations true, and sentenced him to 16 years imprisonment.  (CT 540-41.)

Petitioner appealed, raising the claims presented in the Petition here, other than the ineffective assistance of counsel claims.  (Lodgment Nos. 30-32.)  The appellate court affirmed in an unpublished opinion, although it reduced the sentence by one year.  (Lodgment No. 35.)  Petitioner thereafter filed a petition for review in the state supreme court raising the same claims.  (Lodgment No. 41.)  The state supreme court summarily denied relief.  (Lodgment No. 42.)  Petitioner presented his ineffective assistance of counsel claims to the state appellate court in a habeas petition, which was denied at the same time his conviction was affirmed on appeal.  (Lodgment Nos. 33-34, 36.)  His petition for review of the appellate court's denial of his habeas petition was summarily denied by the state supreme court.  (Lodgment Nos. 43-45.)

### III.

### TRIAL PROCEEDINGS

As discussed in detail below, Petitioner was shot by police on the evening of July 14, 2011, with a knife in his hand while running out of an office suite which had been broken into, and was taken to the hospital with life-threatening injuries.  He was interviewed by the police at the hospital about 8:45 a.m. on July 18, 2011, waived his Miranda[2] rights, and stated that he

---

[2]  Miranda v. Arizona, 384 U.S. 436, 479 (1966) (holding that in order for a statement made during custodial interrogation to be admitted into evidence, a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.")

had attempted to commit "suicide by cop" by running at the police with a knife in his hand, although he said he was not sure whether he ran at the officers or away from them. A deputy public defender was appointed to represent him at the arraignment, which took place later that day at the hospital. At the arraignment, Petitioner requested to represent himself, and the arraignment was continued because a <u>Lopez</u>[3] waiver form was not available. (CT 463; RT 6.) He withdrew his request to represent himself the next day. (CT 465.) His first court appearance was a readiness conference on August 5, 2011, where he again requested to represent himself; his request was granted and the assigned deputy public defender was relieved. (CT 469; RT 10.) At the next court appearance, August 10, 2011, Petitioner requested appointment of counsel, and the previously-assigned public defender was re-appointed. (CT 471.)

At the next court appearance, August 15, 2011, the first of Petitioner's seven <u>Marsden</u>[4] hearings was held. (CT 473.) Petitioner stated that he was on morphine when he waived his <u>Miranda</u> rights at the hospital and thought his waiver was invalid, and complained that defense counsel had not filed a <u>Pitchess</u>[5] motion in an attempt to challenge the credibility of the officers. (RT 3-22.) Petitioner said he wanted to argue that he was in the process of throwing the knife away and turning to run from the officers when he was shot, but defense counsel thought the forensic evidence, the officers' statements, and Petitioner's statement that he wanted to commit suicide by cop, all suggested he was running toward the officers when shot. (<u>Id.</u>) The motion was denied as premature because defense counsel had not yet reviewed all of the discovery, which had been given to Petitioner while he was representing himself. (RT 21.)

---

[3] <u>People v. Lopez</u>, 71 Cal.App.3d 568, 571 (1977) (setting forth a suggested set of advisements designed to ensure a clear record of a defendant's knowing and voluntary waiver of the right to counsel), citing <u>Faretta v. California</u>, 422 U.S. 806, 819-36 (1975) (holding that the Sixth Amendment implies a right to self-representation, and a state violates that right when it forces a criminal defendant to accept a state-appointed attorney after he knowingly and intelligently waives his Sixth Amendment right to counsel and clearly and unequivocally declares a desire to represent himself).

[4] <u>People v. Marsden</u>, 2 Cal.3d 118, 123 (1970) (holding that a criminal defendant represented by appointed counsel or the public defender may request that the court discharge the attorney and substitute new counsel if the defendant's right to counsel would be substantially impaired by continuing with the original attorney).

[5] <u>Pitchess v. Superior Court</u>, 11 Cal.3d 531 (1974) (providing for discovery of personnel records of police officers), superceded by statute as stated in <u>Arcelona v. Municipal Court</u>, 113 Cal.App.3d 523, 528-30 (1980).

The second Marsden hearing was held on October 20, 2011, after the preliminary hearing but before trial began. (CT 478.) Petitioner complained again about counsel's failure to file a Pitchess motion, argued that he should only be charged with commercial burglary, and said that because he had not been in custody for the previous five years, the prior conviction sentence enhancement allegations should be dismissed. (RT 27-28.) Defense counsel explained that he had tried at the preliminary hearing to have the assault on a peace officer charges dismissed based on a statement by one of the officers that Petitioner said immediately after he had been shot, "I didn't realize you were the police," that he had tried to negotiate a plea offer where assault on a police officer was taken off the table, but the prosecutor insisted on including assault on a police officer in any plea bargain, and said he had explained to Petitioner that the evidence was pretty compelling that he had assaulted the officers. (RT 29-30.) Defense counsel also stated that he intended to file a suppression motion arguing that Petitioner's Miranda waiver was not voluntarily due to his medicated state, but had told Petitioner he did not think it would be successful, and said that the prosecution had agreed to a continuance for a Pitchess motion.[6] (RT 31.) The Marsden motion was denied on the basis that counsel was providing appropriate representation and there had been no breakdown in communication. (RT 33-34.)

The third Marsden motion was held on February 14, 2012, a week before the trial began. (CT 481-82.) Petitioner complained that defense counsel: (1) wanted to represent at trial that Petitioner came out of the office with a knife in his hand running toward the officers, whereas Petitioner contended that the knife had been shot out of his hand as he was tossing it and running away from the officers: (2) had not investigated inconsistencies in the officers' statements, and did not intend to argue that the officers did anything wrong during the shooting; (3) did not hire a firearms expert to testify about the trajectory of the bullets but was going to rely on a blood spatter expert to argue Petitioner was moving away from the officers when shot; (5) did not intend to argue voluntary intoxication during the crimes; and (6) told Petitioner that he had reviewed the Pitchess material and did not find anything usable but would not share it with

---

[6] Defense counsel filed a pre-trial Pitchess motion on November 4, 2011, alleging that Petitioner was running away from the officers when shot and that the officers were lying when they said he was running toward them, but the record is unclear regarding its resolution. (CT 25-42.)

Petitioner.  (RT 37-41.)  Defense counsel stated that he had advised Petitioner that in his opinion it was a justified shooting, and that if they tried to argue otherwise they would lose credibility with the jury.  (RT 43-44.)  He indicated that they could present a defense that Petitioner was not charging the officers and was running away when shot without challenging their credibility, because: (1) the officers were factually wrong when they testified at the preliminary hearing that Petitioner's only exit was through them, as they were unaware there was an exit to Petitioner's left; and (2) they did not need a firearms expert because the forensic evidence already suggested Petitioner was heading left when shot, other than a small amount of his blood which had splashed towards the officers, which the prosecution expert indicated showed that Petitioner was on his way toward the officers when shot, but which the defense blood spatter expert was prepared to testify could not conclusively establish direction.  (RT 43-44.)  The motion was denied on the basis that they were merely disagreeing on trial strategy, which was the sole province of the attorney.  (RT 49.)

Defense counsel filed a pre-trial motion to exclude Petitioner's statement at the hospital that he wanted the officers to kill him, and the trial court held an evidentiary hearing on February 22, 2013.  (CT 485, 487; RT 304-38.)  The trial judge denied the suppression motion, finding that Petitioner appeared to understand his rights, made a voluntary statement after waiving his rights, and there was no evidence that his pain or his pain medication affected his state of mind.  (RT 338-39.)  Defense counsel filed a pre-trial motion to exclude the prosecutor's blood spatter expert from testifying that the small amount of Petitioner's blood found between his body and the officers could be interpreted as an indication that he was moving in that direction, but defense counsel withdrew the motion after the trial court held an evidentiary hearing and counsel was satisfied regarding the expert's qualifications.  (RT 340-53.)  The trial court granted the prosecution's pre-trial motion to exclude Petitioner's statement to the police, made immediately after he was shot, to the effect, "I thought you were security" and, "help me, help me, I don't want to die."  The court found that the second part was not relevant, and that the first part was neither a dying declaration nor a spontaneous statement, and did not go to his state of mind; the trial judge left open the possibility that the first part could come in as an inconsistent statement,

with the understanding that if it did Petitioner could be impeached with his prior convictions. (CT 488, 492; RT 312-19, 362-64.)

On February 23, 2012, the first day of trial, and before any testimony was taken, the fourth Marsden hearing was held.  (CT 490.)  Petitioner indicated that his reasons for seeking new counsel were "quite the same" as his previous motions, in that defense counsel: (1) refused to hire a firearms expert regarding the trajectory of the bullets to show he was running away when shot, and did not intend to call the blood spatter expert because the blood spatter expert would not be able to prove which direction he was running; (2) had not spent sufficient time discussing the case with him; and (3) had not sufficiently examined the record regarding all the statements Petitioner made at the hospital regarding his state of mind as it related to his ability to knowingly waive his Miranda rights, or the exact statement he made immediately after he was shot. (RT 371-73.)  Defense counsel explained that he did not think a firearms expert would add anything to the case since the bullet trajectory aspect of the prosecution's expert's opinion was favorable to the defense theory that Petitioner was turning to his left when shot, and although the initial report of the prosecution expert indicated that the blood spatter evidence showed Petitioner was moving toward the officers, defense counsel had hired a blood spatter expert who would testify that the evidence was not conclusive as to the direction Petitioner was moving. (RT 374-75.)  Defense counsel indicated that he did not intend to call his blood spatter expert, however, because the prosecution expert had testified at the evidentiary hearing that the blood spatter evidence, although consistent with Petitioner moving towards the officers, was not conclusive and was open to other interpretations, and defense counsel did not want to call his blood spatter expert to testify to the same thing because it might bolster the prosecution's expert in front of the jury. (RT 375-76.)  The Marsden motion was denied on the basis that counsel was proceeding appropriately, including attempting to introduce Petitioner's statement that he did not know the responding officers were police.  (RT 378-80.)

Sergio Rodriguez testified that he was working alone in his office on the third floor of a four-story office building on Third Avenue in San Diego about 10:00 p.m. on July 14, 2011, when heard a loud pounding noise, as if someone were pounding on a glass window, followed

1   by the sound of breaking glass.  (RT 412-22.)  The building is rectangular, with the interior open

2   to the sky and ringed on the inside with office suites; the third and fourth floor office suites look

3   down on a second floor courtyard which is also ringed with office suits.  (RT 414-15.)  The first

4   floor is a parking garage with open access to vehicles and pedestrians from the street, even after

5   hours, but the second through fourth floors can only be accessed by an elevator or by stairwells

6   from the first floor parking garage; the elevator and stairwells are supposed to be locked after

7   6:30 p.m., and a key is then required to operate the elevator, to enter the stairwells at the garage

8   level, or to exit the stairwells on any upper level.  (RT 415-18, 491, 649.)  Rodriguez testified

9   that when the police responded to his 911 call, he threw them the keys to the stairwells and

10  elevator from his third-floor exterior office window.  (RT 425-27.)  He locked himself inside his

11  office, and, while waiting for the police to come to his door, heard gunshots.  (RT 428-29.)

12      Brandon Jordan, a City of San Diego Police Officer, testified that about 10:00 p.m. on

13  July 14, 2011, he and his partner Officer Andres Ruiz were in uniform on patrol in a marked

14  police car, and responded to a call of a break-in at an office building on Third Avenue.  (RT 452-

15  55.)  Jordan said he and Ruiz were the first officers to respond, and a person on the third floor

16  threw them the keys to the building.  (RT 458-59.)

17      Jordan requested backup, including a K-9 unit, because he wanted to establish a perimeter

18  and wanted assistance searching the large building.  (RT 459.)  About 15 minutes after obtaining

19  the keys, Officers Jordan and Ruiz entered the first floor, found the elevator unlocked, gave the

20  keys to the other officers to use on the stairwells, and went up to the second floor in the elevator.

21  (RT 490-94.)  When Jordan and Ruiz exited the elevator on the second floor, Jordan looked to

22  his left in the "very dark" courtyard, and observed that a small tree in a planter had been thrown

23  through the window of an office.  (RT 494.)  Jordan had his gun in his right hand, which had a

24  flashlight attachment, and had been told by the dispatcher that the reporting party was locked

25  in his office on the third floor and was the only person working in the building at the time.  (RT

26  495-96.)  Jordan scanned the interior of the office with his flashlight and immediately saw a

27  shadowy figure running full speed from inside the office toward Ruiz and himself.  (RT 499.)

28  Jordan yelled, "Get on the ground."  (RT 500.)  The person came running out of the office

-8-

through the broken window at a full sprint towards but to the right of the officers; Ruiz and Jordan were both facing the broken window with Ruiz a step and a half behind and to the left of Jordan; Jordan began to holster his weapon in order to tackle the person, but Ruiz fired three shots and the suspect fell to the ground. (RT 501-04, 608.) Jordan said he did not fire because he had not seen any weapons or threats that justified the use of lethal force. (RT 504.)

When the suspect hit the ground, Jordan pointed his gun at him and yelled several times for him to show his hands, a routine procedure used to determine whether a suspect poses a threat. (RT 505-06.) The suspect rolled a little and moaned, but did not comply with the command; Jordan said Ruiz rolled the suspect over on his back and kicked a knife out of his hand. (RT 506-08.) The suspect was wearing a backpack and there was a camera on the ground next to him. (RT 508.) Jordan lifted the suspect's shirt and observed a through and through wound to the forearm and a grazing wound to the neck. (RT 509-10.)

Seth Krosner, a trauma surgeon at Scripps Mercy Hospital, testified that he was the admitting physician when Petitioner arrived at the hospital. (RT 516-17, 529.) Petitioner had a gunshot wound to his neck behind the right ear, as well as entry and exit wounds to the right forearm near the wrist. (RT 517-25.) The bullet which entered the neck had traveled to the breastbone where it stopped between the aorta and the pulmonary artery, where it was removed, and it was "rather miraculous" that it did not injure either of those arteries, which would have killed the patient at the scene. (RT 525-28.) Randal Vecchione, a plastic surgeon, testified that he was present at Petitioner's surgery and observed an entry wound on the front of the wrist and an exit wound to the back of the wrist. (RT 543-49, 555.)

Andres Ruiz, a City of San Diego Police Officer, testified that he was in uniform on patrol when he and his partner Officer Jordan responded to an office building on Third Avenue on July 14, 2011. (RT 639-41.) They set up a perimeter and took the elevator to the second floor. (RT 642-43.) Ruiz stepped out of the elevator first, about a step and a half ahead of Jordan; Ruiz looked to his left and saw that a planter had been thrown through a glass window with the plant protruding from the window; he announced in a loud, deep voice that they were from the San Diego Police Department. (RT 652-58.)

Ruiz was in the process of informing the other officers over the radio of the broken window when he heard Jordan, who was about a foot in front and to the right of Ruiz, yell, "get on the ground." (RT 660.) Ruiz raised his handgun and saw a man coming out of the broken window, about ten feet away, with a black object in his left hand, which turned out to be a camera, and a knife in his right hand. (RT 660-61.) The flashlight mounted on Ruiz's firearm caused a reflection on the knife and he instantly recognized it as a knife. (RT 662-63.) The suspect was crouched down coming through the window holding the knife waist high; Ruiz said, "stop, stop, stop," but the suspect did not comply and continued to run at the officers, and Ruiz feared for their safety. (RT 663-64.) The only exit as far as Ruiz knew was the elevator, and he thought the suspect might be attempting to fight his way through them to the elevator, so he fired three rounds from about eight feet as he was moving backward and the suspect was coming toward him. (RT 664-66.) Ruiz said he learned later that there were three exits available to the suspect, the elevator and a stairwell to their left, both of which would have required the suspect to go through the officers, and a stairwell to the suspect's left. (RT 664-65, 707.)

Ruiz testified that he saw out of the corner of his eye that Jordan had made a motion to holster his weapon and that it looked as though Jordan intended to "go hands-on with the suspect," which Ruiz thought was a bad idea because it would have been an unarmed response to an armed suspect. (RT 666-68.) There was no time for Ruiz to warn Jordan that the suspect had a knife, and Ruiz fired when the suspect was about seven feet from Jordan. (RT 668-69.) The suspect fell to the ground and rolled on his right shoulder. (RT 672.) Ruiz ordered the suspect to show his hands but he did not comply, so Ruiz grabbed the suspect by the handle of the backpack he was wearing, turned him over, and kicked the knife away from where it was lying next to the suspect's right hand. (RT 674-75.) Two other officers were in the stairwell banging on the locked door and asking for it to be opened. (RT 677.)

Janice O'Sullivan, a licensed Marriage and Family Therapist and a member of the Psychiatric Liaison Team at Scripps Hospital, testified that the attending physician requested a psychiatric assessment of Petitioner, and that she interviewed him at 4:30 p.m on July 19, 2011, while he was handcuffed to a hospital bed with two police guards at the foot of the bed. (RT

719-23.) Petitioner told her, "that he had broke into a dental office, sat smoking marijuana waiting for the police to come shoot him," and that, "he picked up a knife in the office and was waving it around to get the police to shoot him." (RT 723.) Petitioner appeared to O'Sullivan to be "kind of chummy with the police" during the interview, and she was surprised that he seemed "a little cheerful for the situation," but thought it was possible that Petitioner was unwilling or embarrassed to express sadness or other emotions in front of the two male police officers. (RT 724.) Petitioner told O'Sullivan that he was no longer suicidal, but that he had been suicidal when he went to the office to get the police to shoot him that night, and he admitted that his actions that night constituted a suicide attempt. (RT 726.)

The office manager of the dental office that was broken into on the night of July 14, 2011, testified that the office and several drawers had been rifled through, a computer was missing, it's monitor had been picked up and thrown in a trash can, and an expensive camera belonging to the office was lying on the floor just outside the broken office window. (RT 733-40.) The knife lying on the ground outside the broken window did not belong to the office, and the stolen computer was found in the backpack Petitioner was wearing. (RT 740, 908-09.)

Glenn Wagner, the Chief Medical Examiner for San Diego County, testified that based on his review of the medical records, the wound to Petitioner's right wrist was caused when the bullet entered through the front, palm-side of the wrist, and not, as the treating physician opined, that the bullet had entered through the back of the wrist. (RT 780-93, 808.) The bullet which caused the wound to Petitioner's neck traveled in a downward trajectory from right side of the neck into the sternum, suggesting that Petitioner may have been hunched over and running directly toward but slightly to the right of the shooter. (RT 793-814.)

Bill Loznycky, a Criminalist with the Firearms Unit of the San Diego Police Department Crime Laboratory, testified that in his opinion the shots fired from Officer Ruiz's handgun traveled toward the office from outside the elevator door at a slight downward trajectory. (RT 833-36.) He opined that blood stains which were six feet, nine inches in front of the office could be interpreted as an indication that Petitioner was moving toward the officers when shot, but he admitted such a conclusion was by no means conclusive. (RT 848-50, 861-84.)

John Rzucidlo, a San Diego Police Officer, testified that he and his partner Ryan Seemer were in uniform and responded to the office break-in on July 14, 2011. (RT 916-17.) Rzucidlo, his Sergeant, and a K-9 unit officer were in the stairwell and were about to exit onto the second floor when Rzucidlo heard an Ruiz yell, "get down, get down, get down," followed by three gunshots. (RT 917-19.) It took about 60 seconds to find the right key to exit the stairwell, and upon exiting Rzucidlo saw a man lying on the floor bleeding from his neck area, with Ruiz and Jordan pointing their service weapons at the man. (RT 920.)

Joseph Pardue, a San Diego Police Officer, testified that he was assigned to monitor Petitioner at the hospital on July 19, 2011. (RT 930-31.) They were alone together about 10:30 a.m. when Petitioner made a spontaneous statement, not directed at Pardue as far as he could tell, to the effect that, "I snapped. I went up there to have officers shoot me." (RT 931-32.)

Jeffrey Germain, a San Diego County Deputy Sheriff, testified that he was assigned to guard Petitioner in the hospital on July 27, 2011. (RT 1314-15.) Germain testified that, "When I asked him what happened, he told me that he was trying to commit suicide by cop. He had stopped at a marijuana dispensary, purchased marijuana, broke into a local business and smoked a joint as he waited for the police to show up. Then when they did, he ran at them with a knife until they shot him." (RT 1315-16.) Defense counsel objected to the testimony on the basis that Germain already knew why Petitioner was in custody, as he had been briefed and had access to his records, and that he had clearly interrogated Petitioner outside the presence of counsel. (RT 1309-12.) Outside the presence of the jury, Germain testified that he had asked Petitioner what had happened, "because we're together in a room for 12-and-a-half hours and I want an idea for my own safety the extent of his injuries and what they were." (RT 1304.) The trial judge ruled that the question did not constitute interrogation. (RT 1310-11.)

Brett Burkett, a City of San Diego Police Department Homicide Detective, testified that he interviewed Petitioner at the hospital on July 18, 2011, four days after he was shot. (RT 1355-59.) He said Petitioner was lying on his back in a hospital bed attached to several medical devices, and was calm and talkative. (RT 1357-58.) A recording of that interview was played for the jury and a transcript is in the record. (RT 1361; CT 158-69.)

According to the transcript, Detective Burkett told Petitioner that he knew he was on medication, asked Petitioner if he was doing okay, confirmed that Petitioner could identify the color of Burkett's shirt and necktie, and read him his Miranda rights. (CT 159-60.) Petitioner indicated that he understood his rights, and when asked if, keeping those rights in mind, he wanted to talk, Petitioner replied: "Might as well. It don't matter." (CT 160.)

Petitioner said he had been going, "through a lot of shit with the police department down in my area," had become frustrated with being in and out of jail for things that were not his fault, and decided he would rather be dead. (CT 160, 162-63.) He said he had entered the office and waited for the police to arrive, and when they did, "I don't think I run at 'em but I [sic] running away from 'em and just got cut off. But I wanted to die anyway so maybe I did. I'm not sure about that. I don't know if I ran at 'em or ran away from 'em." (CT 161.) When asked why he did not give himself up, he responded, "Cause I wanted to die, man. I didn't want to go back to jail, I wanted to die." (CT 163.) He said he went the office to, "set a fire or something that would bring the police up in there," but as he was approaching the office he heard someone else break the office window, and chased that person away. (CT 163-64.) He admitted the backpack he was wearing when shot belonged to him and that he had put a camera from the office in it, but denied putting the computer in the backpack. (CT 165.) He said he found the knife in a drawer in the office and thought the police would be more likely to shoot him if he ran at them with a knife in his hand, but said he did not want to hurt anyone. (CT 166.) When asked why he did not just hurt himself, he said, "I tried that before. . . . Plenty of times. I tried hanging myself, cutting myself, jumping off a roof with a noose around my neck. None of that shit worked. A bullet would work. It didn't work either. It ain't my time." (CT 166-67.) He said he had the knife in his hand because he wanted the police to shoot him, "But I don't think I was going toward him. I was going away from him because I was shot on the side." (CT 168.)

The People rested and the defense called no witnesses. (RT 1386.) The defense moved to dismiss the knife use allegation on the basis that the prosecution had presented no evidence that the knife was used in a menacing fashion or used during the commission of the burglary. (RT 1391-94.) The prosecutor argued that the allegation should be decided by the jury because

the knife was in Petitioner's hand as he was either trying to assault the officers or escape with the stolen property during the burglary.  (Id.)  The motion was denied.  (RT 1394.)

Petitioner's fifth Marsden hearing was held on March 2, 2012, after the parties had rested but before closing argument.  (CT 513.)  Petitioner complained that he had been unaware that the knife use allegation was attached to the burglary count, and if he had known, he would have taken the stand to testify or represented himself.  (RT 1563-64.)  Defense counsel indicated that the knife use allegation had been dismissed as to the receiving stolen property count at the preliminary hearing, but the preliminary hearing judge had ruled, over a defense objection, that the knife use allegation would not be dismissed as to the burglary count because the burglary was still in progress when Petitioner was shot.  (RT 1565-66.)  Defense counsel also said he intended to argue to the jury that Petitioner was not holding the knife in a menacing manner. (RT 1565.)  Petitioner then withdrew his Marsden motion.  (RT 1566.)

The jury was instructed and counsel presented argument.  (RT 1432-1551.)  Defense counsel conceded Petitioner's guilt on the burglary and receiving stolen property counts, but argued that if Petitioner was running away from the officers when he was shot then he could not be found guilty of any of the assault charges, and that the most reasonable interpretation of the fact that there was no blood on the knife was that Petitioner had dropped it and was running away from the officers when he was shot.  (RT 1532-33.)  He pointed out that Petitioner told the police at the hospital that he did not know if he ran at the officers or away from them, and in light of police training to secure incriminating statements in such settings, and the medication he was on, that statement was insufficient proof that he had run toward the officers, particularly since out of court statements must be corroborated by other evidence.  (RT 1534-35.)  He argued that the other evidence did not support such a finding, as the officers testified that Petitioner was shot while still coming through the window, or just a foot or two out of the window, and that he was moving left, toward the exit, where he fell and where his momentum would be expected to take him if he was running away, that the blood spatter evidence was inconclusive, and that the testimony of the doctors was consistent with his running away.  (RT 1536-44.)  He argued that Petitioner dropped the knife as he exited the office, but even if he was running with it in his

1    hand, it would be insufficient to prove he was using it in a menacing way. (RT 1540.) He also

2    said he was not calling into question the officer's decision to shoot, because the officer was not

3    aware there was an exit to Petitioner's left, but argued that the officer could have made the right

4    call in the heat of the moment and still been wrong about the need to shoot. (RT 1543-44.)

5           The jury found Petitioner not guilty of assault with a deadly weapon on a peace officer,

6    and not guilty of the lesser included offenses of assault with a deadly weapon and simple assault

7    (counts one and two), but guilty of burglary with the personal use of a deadly and dangerous

8    weapon, a knife (count three); and guilty of receiving stolen property (count four). (RT 1800-

9    03.) He waived his right to a jury trial on the prior conviction allegations. (RT 1805-08.)

10          Petitioner's sixth Marsden hearing was held on March 9, 2012, after the verdicts were

11   returned and just before the bench trial on the prior conviction allegations. (CT 528.) Petitioner

12   complained that there was insufficient evidence to support the knife use allegation, and that

13   defense counsel had failed to argue that he could not be convicted of both burglary and receiving

14   stolen property. (RT 1854-56.) Defense counsel pointed out that Petitioner could not be

15   punished for both burglary and receiving stolen property, and repeated that he had made a

16   request to have the knife use allegation dismissed at the close of the prosecutor's case because

17   there was no evidence it was held in a menacing manner, which he had argued that to the jury,

18   and said that he intended to argue in a post-trial motion, and on appeal if necessary, that the

19   jury's acquittal of Petitioner on the assault charges was incompatible with their knife use finding

20   on the burglary count. (RT 1856-57.) The judge denied the Marsden motion on the basis that

21   the knife use allegation had been appropriately presented to the jury, and that defense counsel

22   "did a masterful job" securing acquittals on the two major charges, and, "has been an excellent

23   attorney, one of the best I've seen." (RT 1857-59.)

24          A bench trial was held on the priors. The trial judge found that Petitioner was convicted

25   of vehicular burglary in 1985, residential robbery with the use of a knife in 1990, possession of

26   marijuana for sale in 1995, and petty theft with a prior in 2001, and that he had served prison

27   terms for those offenses and had not remained free of custody or a new felony conviction for five

28   years following release from custody on each conviction. (RT 1807-08, 1872-73.)

Petitioner's seventh and final <u>Marsden</u> motion was made on April 27, 2012, prior to sentencing. (CT 533.) Petitioner repeated his objection that defense counsel should have argued that he could not be charged with burglary and receiving stolen property at the same time, objected that the jury instruction on the knife use allegation did not provide a definition of "menacing," and repeated his allegation that he had not spent sufficient time with his attorney. (RT 1878-80.) Defense counsel stated that they had spent sufficient time together, and submitted on the legal issues. (RT 1879.) The motion was denied on the basis that Petitioner had been properly charged and convicted on both burglary and receiving stolen property, although he could only be sentenced on one of those charges. (RT 1881.) The trial judge stated that: "Mr. Tandon did an outstanding job, one of the best arguments I have heard in my entire 30 years - actually, 32 years in the criminal justice system. He is a phenomenal attorney. So there is nothing that I have seen based upon his conduct or the way he has argued the law, either before the court or before the jurors, that leads me to believe that he has provided ineffective assistance of counsel." (<u>Id.</u>)

Petitioner retained new counsel on July 20, 2002, who filed a motion to strike the prior serious felony conviction. (CT 401-06, 536.) Counsel argued that the strike prior was 22 years old, that all of Petitioner's prior convictions were related to his drug addiction, that he had been diagnosed with schizophrenia at age nine and all his drug use was related to self-medicating his mental illness, and that he had stayed out of prison for five years with steady employment before the present offense, which was the result of a drug relapse triggered by the tragic death of his brother. (RT 1892-94.) On October 24, 2012, the trial judge denied the motion, and sentenced Petitioner to three years on the burglary count, doubled to six years under the Three Strikes law, plus a one-year enhancement for the knife use finding; six years on the receiving stolen property count, which was stayed; five years consecutive for the strike prior; and one year consecutive for each of the four prison priors; for a total of 16 years imprisonment. (RT 1898-1901.) The appellate court reduced the sentence to 15 years, finding it was error to impose both a one-year enhancement and a five-year enhancement on the prior strike conviction. (Lodgment No. 35, <u>People v. Garrett</u>, No. D062969, slip op. at 22 (Cal.App.Ct. Feb. 24, 2014).)

# IV.

## **PETITIONER'S CLAIMS**

(1) Petitioner's Fifth Amendment privilege against self-incrimination was violated by the introduction of his statement to Deputy Sheriff Germain because Petitioner was interrogated in the absence of counsel after counsel had been appointed.  (Pet. at 6.)

(2) Petitioner's Fifth Amendment privilege against self-incrimination was violated by the introduction of his statement to Detective Burkett because Petitioner's <u>Miranda</u> waiver was not voluntary, knowing and intelligent due to his mental condition and medicated state.  (Pet. at 7.)

(3)  Petitioner's Fourteenth Amendment right to due process was violated by the cumulative effect of the errors in the introduction of his statements to Germain and Burkett, and the error alleged in Claim 4 regarding the deadly weapon use finding.  (Pet. at 8.)

(4)  Petitioner was denied his Fourteenth Amendment right to due process because there was insufficient evidence that he personally used a deadly or dangerous weapon during the commission of the burglary.  (Pet. at 9.)

(5)  Petitioner was denied his right to the effective assistance of counsel, as protected by the Sixth and Fourteenth Amendments, by his trial counsel's failure to: (1) argue that he had been in the process of throwing the knife back into the office when he was shot; (2) object that the jury instruction on use of a deadly weapon allegation did not define "menacing"; (3) argue at sentencing that a five-year washout period rendered the prior convictions unusable as sentence enhancements; (4) introduce evidence of Petitioner's mental illness; (5) introduce evidence that the officers made prior inconsistent statements that Petitioner had not waived the knife at them; and (6) introduce evidence regarding the drugs which were in his system at the hospital when he waived his <u>Miranda</u> rights.  (Pet. at 11.)

# V.

## **DISCUSSION**

For the following reasons, the Court finds that an evidentiary hearing is neither necessary nor warranted, and that habeas relief is not available because the adjudication by the state court of Petitioner's claims is neither contrary to, nor involves an unreasonable application of, clearly

established federal law, and is not based on an unreasonable determination of the facts.  The Court recommends that the Motion for an evidentiary hearing and the Petition be **DENIED**.

**A.      Standard of Review**

Title 28, United States Code, § 2254(a), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides, with respect to claims which were adjudicated on their merits in the state court, that in order to obtain federal habeas relief, a petitioner must first demonstrate that the state court adjudication of the claims: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.A. § 2254(d) (West 2006). Even if the petitioner can satisfy § 2254(d), or show that it does not apply, he still must show a federal constitutional violation occurred.  Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).  Petitioner must also demonstrate that any constitutional error is not harmless, unless it is of the type included on the Supreme Court's "short, purposely limited roster of structural errors."  Gautt v. Lewis, 489 F.3d 993, 1015 (9th Cir. 2007), citing Arizona v. Fulminante, 499 U.S. 279, 306 (1991) (recognizing that "most constitutional errors can be harmless.").

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407.  Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded

disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, __, 131 S.Ct. 770, 787 (2011).

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . ." Williams, 529 U.S. at 412.  In order to satisfy § 2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S.Ct. at 786-87.  The Supreme Court has stated that "[i]f this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents."  Id. at 786 ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.") (internal quotation marks omitted).

**B.    Claim 2**[7]

Petitioner alleges in Claim 2 that the introduction of the statements he made at the hospital to Detective Burkett violated his Fifth Amendment privilege against self-incrimination. (Pet. at 7.)  He contends that the totality of the circumstances showed he did not knowingly and intelligently waive his Miranda rights, in that he was recovering from life-threatening injuries,

---

[7]  Because the analysis of Claim 2 informs the resolution of Claim 1, the Court will discuss Claim 2 first.

was under the influence of strong narcotic painkillers, had a long history of mental illness, had just attempted suicide, and showed disorientation during questioning.  (Id.)

Respondent answers that the state appellate court's denial of this claim, on the basis that there is nothing in the record to suggest Petitioner's mental or physical condition rendered his waiver invalid, is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  (Ans. Mem. at 38-47.)  Petitioner replies that Burkett was aware of his long history of mental illness, and aware that he was under the influence of powerful narcotic pain killers, but interrogated him knowing the waiver was invalid.  (Traverse at 11, 19.)

Petitioner presented this claim to the California Supreme Court in a petition for review, and to the state appellate court on direct appeal.  (Lodgment Nos. 30, 41.)  The state appellate court denied the claim in a reasoned opinion, and the state supreme court summarily denied the petition for review without a statement of reasoning.  (Lodgment Nos. 35, 42.)  The Court applies the following rebuttable presumption: "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991). The Court will look through the silent denial of this claim by the state supreme court to the appellate court opinion, which stated:

> Defendant asserts the court erred in denying his motion to suppress the recorded statements he made to Detective Burkett at the hospital because he did not knowingly and intelligently waive his *Miranda* rights.
>
> At an Evidence Code section 402 (section 402) hearing addressing the *Miranda* issue with respect to Detective Burkett, Burkett testified that on the morning of July 18 (four days after the shooting) he interviewed defendant at the hospital for about 15 minutes.  Defendant was attached to "various items of medical intervention" such as I.V. tubes. Defendant did not complain about being in pain or show signs of pain, but Detective Burkett thought his situation "looked painful" because he had a tube near his neck and it took him "some time to answer." Detective Burkett said to defendant, "'I know you're on medication, but you know where you are, right?'" Defendant made no complaints about being on medication, and they continued to talk.  An officer who accompanied Detective Burkett asked defendant if he could identify the clothing the officer was wearing, and defendant stated the officer was wearing a blue shirt and red tie.
>
> When Detective Burkett provided the *Miranda* advisements and asked if defendant understood them, defendant responded, "'Yes, sir.'"  When Detective Burkett asked if defendant wished to speak with him, defendant responded, "'Might as well.  It don't matter.'"

Detective Burkett testified that painkillers tend to have a calming effect, and defendant did not appear to be under the influence of a controlled substance. During the interview, defendant appeared to comprehend what Detective Burkett was saying, and their interaction was "like a regular conversation." Defendant answered responsively to questions about what he was doing at the location, and about his actions and motivations. Defendant told the detective that a "'a white guy'" broke into the place, and he came "after the white guy . . . ." Detective Burkett told defendant there was a witness at the scene and the witness never saw another man there; defendant asked what the witness had seen; and Detective Burkett responded the witness heard the break-in but did not actually see defendant. Detective Burkett testified that during the interview defendant kept repeating that he wanted to die, but he otherwise mostly stayed on topic.

The trial court denied the suppression motion, stating the detective indicated defendant appeared able to comprehend and to have a conversation; the fact that defendant might have been in pain or taking pain medications did not necessarily show his ability to comprehend was affected; and the totality of the circumstances described by the detective showed defendant "understood what was going on in the conversation in the hospital."

To protect the Fifth Amendment privilege against self-incrimination, the *Miranda* rule provides that statements made during a custodial interrogation cannot be admitted as evidence of guilt unless the defendant was advised of and waived the rights to remain silent and to counsel, and warned about the adverse use of statements. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 380, 382.) To establish a valid *Miranda* waiver, the prosecution must show by a preponderance of the evidence that the defendant *understood* the *Miranda* advisals. (*Id*. at p. 384.) If the *Miranda* warnings were provided, the court may examine "the whole course of questioning" to determine whether the defendant provided a knowing waiver. (*Id*. at p. 388.) On appeal from a denial of a *Miranda* challenge, we defer to the trial court's factual findings if supported by substantial evidence, and independently review whether there was a valid *Miranda* waiver. (*People v. Williams* (2013) 56 Cal.4th 165, 184.)

Defendant contends his waiver at the hospital was not knowing and intelligent because he was likely being treated with narcotic painkillers; he had recently attempted suicide and had a history of mental illness; and during the interview he was disoriented, responded inappropriately to questioning, and digressed from the topic.

The fact that a defendant may be mentally ill, in pain, or using controlled substances during a police interview does not alone compel a conclusion that the defendant was unable to make a knowing and intelligent *Miranda* waiver. (*People v. Whitson* (1998) 17 Cal.4th 229, 249; *People v. Breaux* (1991) 1 Cal.4th 281, 299–301; *People v. Kelly* (1990) 51 Cal.3d 931, 951; *People v. Watson* (1977) 75 Cal.App.3d 384, 397.) Although these are relevant factors to consider, the totality of the circumstances must be examined. (*Kelly, supra*, at p. 950; *Watson, supra*, at p. 396.)

Here, defendant answered affirmatively when Detective Burkett asked if he understood his *Miranda* rights, and Detective Burkett perceived defendant's statements during the interview as responsive and comprehensible. Detective Burkett described various statements made by defendant that reflected defendant was engaging in a rational interaction, including defendant's description of an officer's clothing, his explanation as to how he entered the building, and his query regarding the observations of the witness at the crime scene. This showing

suffices to establish that defendant provided a knowing and intelligent waiver of his *Miranda* rights.  The record does not suggest that defendant's mental or medical condition interfered with his ability to understand what Detective Burkett was saying to him, including regarding the *Miranda* advisements.

Also, we have reviewed the transcript of the recorded interview and conclude that it corroborates Detective Burkett's claim that defendant was rational during the interview.  [FN3]  Contrary to defendant's claim, the transcript does not reflect that he was disoriented during the interview.  Although defendant at one point digressed slightly from the immediate question posed by the detective, the verbal exchanges between defendant and the detective are understandable and logical.  Reflective of defendant's ability to comprehend, during the interview defendant presented his claims to the officers in coherent fashion, including that he was not the person who broke the window; he had no intention of hurting the officers but wanted them to hurt him; the fact that he was shot in his side showed he was running away from the officers; his criminal history showed he committed property crimes but he did not hurt people; and he believed the authorities treated him unfairly.

FN3.  It is not clear from the record whether the trial court was presented with the transcript of the recorded interview for purposes of the section 402 hearing.  As asserted by the Attorney General, we generally confine our review to matters presented to the trial court at the time of its ruling.  However, defendant has requested that we review the transcript, and we exercise our discretion to do so.  (See *People v. Kelly, supra*, 51 Cal.3d at p. 951.)

Defendant further asserts that his response when asked if he wanted to speak ("'Might as well. It don't matter.'") reflects that he did not understand the consequences of waiving his *Miranda* rights.  We are not persuaded.  Standing alone, there is nothing in defendant's expression of resignation that suggests he was confused or could not understand what the detective was telling him.  To support his claim of lack of comprehension, defendant also cites the commencement of the interview when the detective said to defendant "I know you're on medication but do you know where you're at?" and the transcript of the interview denotes defendant's response as "unintelligible."  This small portion of the interview does not show defendant was unable to understand what was being said to him.  Immediately after this, defendant responded to the officers' queries by saying that he could see them and by describing what an officer was wearing.  This reflected his awareness and understanding of the officers' communications.

The trial court did not err in finding that defendant made a knowing and intelligent *Miranda* waiver.  [FN4]

FN4.  Given our holding, we need not discuss the Attorney General's contention that defendant cannot challenge the trial court's ruling based on his history of mental illness because this matter was not presented to the trial court at the section 402 hearing.

(Lodgment No. 35, <u>People v. Garrett</u>, No. D062969, slip op. at 11-15.)

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  It has been clearly established

-22-

for over 40 years that a person's, "Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." <u>Miranda</u>, 384 U.S. at 467; <u>Cooper v. Dupnik</u>, 963 F.2d 1220, 1237 (9th Cir. 1992) (en banc) (holding there "is no question that the Constitutional holding in <u>Miranda</u> is 'clearly established' law."); <u>Malloy v. Hogan</u>, 378 U.S. 1, 6 (1964) (holding that "the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States.").

The <u>Miranda</u> warnings are designed "to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." <u>Miranda</u>, 384 U.S. at 469. A <u>Miranda</u> waiver must be "voluntarily, knowingly and intelligently" made in order to be valid. <u>Id.</u> at 444. "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused.'" <u>North Carolina v. Butler</u>, 441 U.S. 369, 374-75 (1979), quoting <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938).

The transcript of the interview with Petitioner begins:

| | |
|---|---|
| Burkett: | It's July 18, 2011, Detective Burkett with Sgt. Johnson. It's 15 til 9 and we're at Scripps Mercy Hospital to interview Mr. Garrett. How you doing, William? I'm Detective Burkett. I'm with the San Diego Police Department. |
| Petitioner: | Yeah. |
| Burkett: | You doing okay? |
| Petitioner: | Yeah. |
| Burkett: | Okay. |
| Johnson: | Can you hear what we're saying and everything? |
| Petitioner: | Yes I can. |
| Johnson: | Okay cause I know you're on medication but do you know where you're at? |
| Petitioner: | (unintelligible) |
| Johnson: | (unintelligible) can you look at me for a second? Can you turn your . . . can you see me? |

| | | |
|---|---|---|
| 1 | Petitioner: | I see. |
| 2 | Johnson: | Do you know what color shirt I have on? |
| 3 | Petitioner: | Blue, red tie. |
| 4 | Burkett: | Okay, William we'd like to talk to you and get your side of the story. I know you've been here for a few days. It's now the 18th and you've been here since the night of the 14th so . . . early morning of the 15th and uh I'd just like to get . . . a statement from you if, uh you're willing to talk. But understand, William that I have to read you your rights and I know you've been read these before but just would like to get your side of the story. |
| 8 | Petitioner: | Okay. |
| 9 | Burkett: | You have the right to remain silent. If you give up the right to remain silent anything you say can and will be used in court against you. |
| 11 | Petitioner: | Yeah. |
| 12 | Burkett: | You have the right to speak with an attorney of your choice before questioning and have that attorney present during questioning. If you cannot afford an attorney one will be appointed by the courts prior to any questioning if you so desire. That attorney will not cost you anything and those services are free. Do you understand those rights, William? |
| 15 | Petitioner: | Yes sir. |
| 16 | Burkett: | Having in mind and understanding those rights, do you want to talk to us? |
| 18 | Petitioner: | Might as well. It don't matter. |
| 19 | Burkett: | Well can you tell me what happened that night, William? |
| 20 | Petitioner: | Yeah. Uh, I been goin', uh through a lot of shit with the police department down in my area. |
| 21 | Burkett: | Okay. |
| 22 | Petitioner: | And uh, I was getting arrested for nothing and people pulling knives on me . . . I'm going to jail . . . had to bond out for it people beating me up . . . I'm going to jail for it . . . had to bond out for it. People coming and throwing their shit by . . . up on my area. I go to jail and had to bond out for it. |
| 25 | Burkett: | Right. |
| 26 | Petitioner: | I couldn't keep on bonding out for shit like that. |
| 27 | Burkett: | Okay. |
| 28 | | |

1   Petitioner:   Ya know, and I got tired man, I just said, man I might as well be
2                 dead or in jail or locked up.  I rather been dead ya know?

3   Burkett:      Yeah.  So what happened?

4   Petitioner:   I was there.  I waited for them.  I waited for them for a whole hour
                  for them to come, the police.

5   Burkett:      Yeah.

6   Petitioner:   I wanted 'em to kill me.

7   (CT 141-43.)

8         The record reflects that Petitioner was read his <u>Miranda</u> rights before speaking with the

9   officers, that he acknowledged that he understood them, and was willing to talk.  As Detective

10  Burkett correctly pointed out, Petitioner has prior experience with the police, as the record

11  indicates he was convicted of criminal offenses on at least 17 separate occasions prior to the

12  instant offense.  (CT 422-27.)  Petitioner contends that the involuntary nature of his waiver is

13  evident by his odd and unintelligible initial responses, which he alleges was caused either by the

14  narcotic painkillers he presumably had been administered, or by his history of mental illness.

15  However, "the Supreme Court has never said that impairments from drugs, alcohol, or other

16  similar substances can negatively impact the waiver."  <u>Matylinsky v. Budge</u>, 577 F.3d 1083,

17  1095 (9th Cir. 2009) ("We have held that an intoxicated individual can give a knowing and

18  voluntary waiver, so long as that waiver is given by his own free will.")  Petitioner indicated in

19  the state court that he, "suffers from bi-polar disorder and paranoid schizophrenia.  He has spent

20  much of his life under the treatment of psychotropic medications."  (CT 404.)  Although the

21  transcript states "unintelligible" for one of Petitioner's responses, it lists the same for Detective

22  Burkett's response, and there is no indication that Petitioner was incoherent or gave responses

23  which were anything other than, "the product of a rational intellect and a free will."  <u>Townsend</u>

24  <u>v. Sain</u>, 372 U.S. 293, 307 (1963).  Petitioner has not provided a basis for a finding that his

25  mental illness prevented him from understanding his constitutional rights or the consequences

26  of abandoning them, and he certainly has provided no basis for challenging the finding to that

27  effect by the state trial and appellate courts.  <u>See e.g.</u> <u>Mincey v. Arizona</u>, 437 U.S. 385, 396-402

28  (1978) (holding that waiver was not voluntary were the defendant was in the intensive care unit

of a hospital, was unable to speak and communicated through writing, repeatedly asked for the interview to cease, gave incoherent answers, and lost consciousness several times during the interview.)

The Court finds that, "the particular facts and circumstances surrounding the case, including the background, experience, and conduct" of Petitioner, support a finding that his waiver was knowing, voluntary and intelligent. Butler, 441 U.S. at 374-75; Zerbst, 304 U.S. at 464. There is no indication in the record that Petitioner's medication or history of mental illness was a factor in his decision to waive his Miranda rights, and the record does not call into question the reasonableness of the finding in that regard by the state court, particularly given the deference this Court is required to give that finding. See Richter, 131 S.Ct. at 786-87 ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.")

Furthermore, even assuming it was error to admit the statements, relief is not available if the error is harmless. See Fulminante, 499 U.S. at 295 (holding that the introduction of a confession obtained in violation of Miranda is reviewed for harmless error.) The harmless error analysis looks to whether the error "had a substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). The application of Brecht's "substantial and injurious effect" standard "protects the State's sovereign interest in punishing offenders and its good-faith attempts to honor constitutional rights . . . while insuring that the extraordinary remedy of habeas corpus is available to those whom society has grievously wronged." Calderon v. Coleman, 525 U.S. 141, 145 (1998) (internal citations and quotation marks omitted). "Under this standard, an error is harmless unless the 'record review leaves the conscientious judge in grave doubt about the likely effect of an error . . . (i.e.,) that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" Padilla v. Terhune, 309 F.3d 614, 621-22 (9th Cir. 2002), quoting O'Neal v. McAninch, 513 U.S. 432, 435 (1995) and citing Kotteakos v. United States,

328 U.S. 750, 765 (1946) ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.")

Petitioner made an incriminating statement to Burkett to the effect that he had the knife in his hand because he thought the police would be more likely to shoot him if he ran at them with a knife in his hand. (CT 166-67.) However, he also made exculpatory statements, such as when he told Burkett, "But I don't think I was going toward him. I was going away from him because I was shot on the side." (CT 168.) In any case, the incriminating statements he made to Burkett were less incriminating than other, properly admitted statements. Janice O'Sullivan, a member of the Psychiatric Liaison Team, testified that Petitioner told her, "that he had broke into a dental office, sat smoking marijuana waiting for the police to come shoot him," and that, "he picked up a knife in the office and was waving it around to get the police to shoot him." (RT 723.) She said that Petitioner told her that he had been suicidal when he went to the office to get the police to shoot him that night, and admitted that his actions that night constituted a suicide attempt. (RT 726.) Officer Pardue testified that Petitioner made a spontaneous statement to the effect that, "I snapped. I went up there to have officers shoot me." (RT 930-31.) Thus, in light of the admissions contained in Petitioner's other statements that he wanted the police to kill him and that he used the knife in a manner which he thought would cause the police to shoot and kill him, even assuming it was error to admit the statements he made to Detective Burkett to that effect, any such error could not have "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623. The Court is not "in grave doubt . . . as to the harmlessness of the error.'" McAninch, 513 U.S. at 435.

An evidentiary hearing is not necessary where, as here, the federal claim can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis for habeas relief. Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994). Furthermore, because Claim 2 was adjudicated on the merits in state court, this Court must make its § 2254(d) determination based solely on the evidence presented to the state court. Cullen v.

Pinholster, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011).  Petitioner can only proceed to develop additional evidence in federal court if § 2254(d) is satisfied, which it has not been with respect to Claim 1, or, possibly, if there is new evidence which transforms an already-exhausted claim into a new claim which has not been adjudicated on the merits in the state court, in which case § 2254(d) arguably would not apply.  Id. at 1401 n.10; Stokley v. Ryan, 659 F.3d 802, 808-09 (9th Cir. 2011).  Petitioner has not come forward with any new evidence supporting any claim, but relies on the same arguments presented in the state courts.

Accordingly, the Court finds that an evidentiary hearing is neither necessary nor warranted to address Claim 2, and that the appellate court's finding that Petitioner's Miranda waiver was voluntary, knowing and intelligent, is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Alternately, the Court finds any error harmless.  The Court recommends habeas relief be denied as to Claim 2.

## C.    Claim 1

Petitioner contends in Claim 1 that his federal constitutional rights were violated by the admission of testimony of Deputy Germain that in response to his question, "what happened," Petitioner, "told me that he was trying to commit suicide by cop.  He had stopped at a marijuana dispensary, purchased marijuana, broke into a local business and smoked a joint as he waited for the police to show up.  Then when they did, he ran at them with a knife until they shot him." (Pet. at 6.)  Petitioner contends here, as he did in state court, that the question was the type of question Deputy Germain should have known was likely to elicit an incriminating response, and that it was made in a custodial setting, after arraignment and appointment of counsel, without waiver of his Fifth Amendment privilege against self-incrimination, and outside the presence of counsel.  (Id.)

Respondent answers that Petitioner has failed to demonstrate that the state appellate court denial of the claim, on the basis that the question constituted general conversation that does not trigger Miranda warnings, but that even if it did, the admission of the statement was harmless

because the jury was properly presented with essentially the same statements from Burkett and O'Sullivan, is objectively unreasonable. (Ans. Mem. at 28-38.) Petitioner replies that Germain already knew or should have known why Petitioner was in the hospital because Germain had reviewed the jail information, which included Petitioner's mental health history, and should have consulted with the treating physicians regarding the effect of the powerful narcotic pain medication which Petitioner had been administered. (Traverse at 11, 19.)

The Court will look through the silent denial by the state supreme court to the appellate court opinion, which stated:

> Deputy Germain guarded defendant at the hospital after his arraignment and appointment of counsel. At a section 402 hearing addressing the admissibility of defendant's statements to Deputy Germain, Germain testified that when he first contacted defendant, he had received booking information about defendant's general charges and a briefing from the previous guard about such matters as whether defendant had been "acting up or not" and whether he was chained. When Deputy Germain saw defendant's injuries, he asked defendant what happened, without providing the *Miranda* advisals. Deputy Germain explained, "And then I saw his injuries, and I asked him about his injuries. (¶) . . . (¶) . . . I asked him what happened, basically, because we're together in a room for 12-and-a-half hours and I want an idea for my own safety the extent of his injuries and what they were. I asked him what happened, and he responded." [FN5] Defendant told Deputy Germain that he was trying to commit "suicide by cop" by breaking into a business, smoking marijuana and waiting for the police, and then running at them with a knife until they shot him.

> FN5. When questioned on cross-examination, Deputy Germain testified he did not know if he used the exact phrase "'what happened'" when he queried defendant.

> Deputy Germain testified that he was not trying to elicit incriminating information from defendant, but rather his "purpose was making general conversation because we were stuck in a room together and for my own safety, to get an idea of why he was in there." To continue making general conversation, Deputy Germain asked defendant why he wanted to commit suicide, and defendant answered that he "just got tired of living." Deputy Germain also talked with defendant about such matters as defendant's complaints about items that were missing from the meals he was being provided.

> The trial court ruled that Deputy Germain's questions did not constitute interrogation, and thus rejected the defense claim that the statements were inadmissible due to the absence of *Miranda* advisements.

> *Miranda* advisements are required when a defendant is subjected to a custodial interrogation. (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 86.) Interrogation refers not only to express questioning, but also to its functional equivalent; i.e., "'"any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect."'" (*Ibid.*) However, not all police questioning of a person in custody constitutes

interrogation. (*Ibid.*)  The exclusion of communications """"normally attendant to arrest and custody"""" recognizes that the police may properly engage in routine functions that are *distinct from investigatory functions* without giving rise to the *Miranda* requirements.  (*Ibid.*, italics omitted; *People v. Williams, supra*, 56 Cal.4th at pp. 186–188 (questions that are "part of a routine, noninvestigative prison process" are not subject to *Miranda* rules).)  For example, a *Miranda* interrogation does not typically occur when the police ask questions related to safety concerns or engage in casual conversations unrelated to the offense. (*People v. Andreasen, supra*, 214 Cal.App.4th at p. 87; *Commonwealth of Pennsylvania v. Abdul–Salaam* (Pa. 1996) 678 A.2d 342, 351 ("small talk concerning Appellant's family and injury was merely general conversation, which is routinely attendant with a custodial relationship" and "did not rise to the level of an interrogation").)

The fact that information gathered from these routine questions or casual conversations turns out to be incriminating does not alone render the statements inadmissible. (*People v. Andreasen, supra*, 214 Cal.App.4th at p. 87.)  However, an interrogation may emerge during routine or casual exchanges if the police ask questions """"that are designed to elicit incriminatory admissions."""  (*People v. Williams, supra*, 56 Cal.4th at p. 187; *Andreasen, supra*, at p. 88.)  The courts caution that the facts of any routine questioning or casual conversation must be carefully scrutinized to ensure that the police are not using the communication as a pretext for eliciting incriminating information. (*Williams, supra*, at p. 187; *Andreasen, supra*, at p. 88.)  When evaluating whether the *Miranda* requirements should apply during noninvestigative routine or casual exchanges, relevant factors to consider include the nature of the questions, the context of the questioning, the knowledge and intent of the officer asking the questions, the relationship between the questions and the crime, the administrative need for the questions, and any other indications that the questions were designed to elicit incriminating evidence. (*Williams, supra*, at pp. 187–188; *Andreasen, supra*, at p. 88.)

Defendant argues that Deputy Germain's question to him about what happened constituted interrogation because he essentially asked him "about what caused him to end up in custody."

Preliminarily, we do not find Deputy Germain's question about what happened to fall within the safety-related category of permissible questioning without *Miranda* warnings.  Although Deputy Germain may have wanted to acquire more information to determine whether defendant posed a safety risk, the deputy already had general information about defendant's conduct from the booking charges; he could have obtained more information from law enforcement officers; and defendant was in a secure environment.

However, we are satisfied Deputy Germain's question constituted permissible general conversation that does not trigger the *Miranda* requirements. The question about what happened was innocuous and did not specifically ask about what happened in relation to the crime.  For example, defendant could have answered the question by simply saying he was shot, without making any reference to the offense that gave rise to the shooting. Moreover, unlike Detective Burkett, Deputy Germain was not conducting an investigation.  There was nothing in Deputy Germain's inquiry about what happened that suggested he wanted to know about the crime as opposed to the injuries, or that the question was being used as a pretext to elicit incriminating information.  After defendant disclosed what he had done, Deputy Germain did not ask follow up questions about the crime. Considering the totality of the circumstances—including a single question that was made by an officer acting as a guard not an investigator, that made no

specific reference to the offense, and that was made upon viewing the defendant's injuries—we conclude Deputy Germain's question constituted general conversation that was permissible to establish rapport and encourage a cooperative attitude during lengthy guarding activity. (*People v. Andreasen, supra*, 214 Cal.App.4th at p. 89.)

Alternatively, even assuming arguendo Deputy Germain's question constituted interrogation because it implicitly asked for information about why defendant was in custody, the admission of defendant's statements to the deputy was harmless beyond a reasonable doubt. (*People v. Thomas* (2011) 51 Cal.4th 449, 498.) The erroneous admission of evidence is harmless beyond a reasonable doubt if it was "'unimportant in relation to everything else the jury considered on the issue in question . . . .'" (*People v. Neal* (2003) 31 Cal.4th 63, 87.) The jury was properly presented with essentially the same statements by defendant in the interviews with Detective Burkett and therapist O'Sullivan, during which he said that he wanted the police to shoot him because he wanted to die, and he ran with a knife in his hand so the police would feel threatened and shoot him.

Further, to the extent defendant's statements to Deputy Germain buttressed the prosecution's theory that he ran *at*, rather than *from*, the officers, this point had significant relevance to the assault charges of which he was acquitted, but not to the burglary and receiving stolen property charges of which he was convicted. [FN6] Under the prosecution's theory of the case, defendant entered the building with the intent to commit theft, and the nature of defendant's movements while holding the knife had little or no bearing on the theft-related elements of the burglary and receiving stolen property offenses. As to the weapon use finding, there was strong evidentiary support for that finding based on the overall aggressive nature of defendant's conduct, regardless of whether he was running towards or away from the officers. Further, as noted, Detective Burkett's recorded interview and therapist O'Sullivan's testimony provided the jury with multiple statements by defendant showing he was using the knife in an aggressive fashion as he emerged from the office suite. [FN7]

> FN6. Deputy Germain's testimony reflects that defendant unequivocally said that he ran at the officers. In contrast, in the recorded interview with Detective Burkett, defendant repeatedly said he thought he was running away from the officers, although at one point he said he was not sure and he may have been running at them. According to therapist O'Sullivan, defendant said he was waving the knife.

> FN7.   Given our holding, we need not discuss the Attorney General's alternative contention that the *Miranda* waiver provided by defendant to Detective Burkett carried over to Deputy Germain's communications to defendant.

For the same reasons, to the extent defendant is also raising a *Massiah* [FN8] claim of reversible error, we reject this contention. Under *Massiah* principles, upon the commencement of criminal proceedings against a defendant (including after arraignment), the police may not interrogate the defendant outside the presence of counsel. (*People v. Viray* (2005) 134 Cal.App.4th 1186, 1194.) A violation of the right to counsel under *Massiah* occurs when "'a government agent deliberately elicits from a defendant incriminating statements(;) . . . (i.e.,) when the government intentionally creates or knowingly exploits a situation likely to induce the defendant to make incriminating statements without the assistance of counsel, but not when the government obtains such statements through

happenstance or luck.'" (*People v. Williams, supra*, 56 Cal.4th at pp. 189.) Deputy Germain's general question about what happened upon viewing defendant's injuries does not reflect a deliberate elicitation of incriminating statements, and, alternatively, any error was harmless beyond a reasonable doubt. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1313.)

   FN8. *Massiah v. United States* (1964) 377 U.S. 201.

(Lodgment No. 35, <u>People v. Garrett</u>, No. D062969, slip op. at 16-22.)

  The "privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." <u>Illinois v. Perkins</u>, 496 U.S. 292, 295 (1990). "Custodial interrogation means 'questioning initiated by law enforcement officers after a person has been taken into custody . . .'" <u>Id.</u>, quoting <u>Miranda</u>, 384 U.S. at 444. Interrogation includes, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 600-01 (1990). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).

  The state appellate court correctly observed that Petitioner could have reasonably perceived Deputy Germain's question, "what happened," as small talk related to how he was injured, prompting the simple response, "I was shot," as opposed to unreasonably perceiving the question as an invitation to tell Germain all about the events on the night he was shot.  As discussed above in Claim 2, the record does not support a finding that the medication Petitioner was presumably on, or his history of mental illness, contributed in any way to his ability to understand or perceive the true nature of the Germain's question.

  Nevertheless, even if the question was reasonably likely to elicit an incriminating response, the appellate court correctly found any error in the admission of Petitioner's response was harmless.  Deputy Germain testified that Petitioner responded to his question by saying, "he told me that he was trying to commit suicide by cop.  He had stopped at a marijuana dispensary, purchased marijuana, broke into a local business and smoked a joint as he waited for the police to show up.  Then when they did, he ran at them with a knife until they shot him."  (RT 1315.) A similar statement also came in through the testimony of Janice O'Sullivan, who testified that

Petitioner had told her, "that he had broke into a dental office, sat smoking marijuana waiting for the police to come shoot him," and that, "he picked up a knife in the office and was waving it around to get the police to shoot him." (RT 723.) She said that Petitioner told her he had been suicidal when he went to the office to get the police to shoot him that night, and admitted his actions that night constituted a suicide attempt. (RT 726.) In addition, Officer Pardue testified that he was alone with Petitioner when he made a spontaneous statement to the effect that, "I snapped. I went up there to have officers shoot me." (RT 930-31.) Petitioner's interview with Detective Burkett contains admissions by Petitioner that he wanted to provoke the police into killing him. (CT 143: "I wanted 'em to kill me."; CT 150: "Yeah I [broke in because I] wanted them to kill me.")

Thus, even if it was error to admit Germain's testimony, the fact that essentially the same statements came in from other witnesses prevents a finding that any such error "had a substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 623. The Court is not "in grave doubt . . . as to the harmlessness of the error.'" McAninch, 513 U.S. at 435. An evidentiary hearing is neither necessary nor warranted because the claim can be denied on the basis of the state court record, and Petitioner's allegations, even if true, do not provide a basis for habeas relief. Campbell, 18 F.3d at 679; Pinholster, 131 S.Ct. at 1398, 1401 n.10; Stokley, 659 F.3d at 808-09.

The Court finds that an evidentiary hearing is neither necessary nor warranted with respect to Claim 1, and that the state court adjudication of the claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. The Court alternately finds that any error is harmless. The Court recommends habeas relief be denied as to Claim 1.

**D.    Claim 4**[8]

Petitioner alleges in Claim 4 that he was denied his Fourteenth Amendment right to due process because there is insufficient evidence that he personally used a deadly or dangerous

---

[8] Because the allegation of cumulative error in Claim 3 includes the error alleged in Claim 4, the Court will discuss Claim 4 before Claim 3.

1  weapon during the commission of the burglary.  (Pet. at 9.)  He contends he did not use the knife

2  to facilitate the commission of the burglary, or use it in a threatening manner in an effort to

3  facilitate his escape, but merely held it in his hand while he ran through the office window.  (Id.)

4      Respondent answers the state appellate court's denial of the claim, on the basis that there

5  is sufficient evidence for the jury to infer that he displayed the knife in a menacing manner to

6  discourage attempts to apprehend him and to facilitate his escape, and that such a finding is not

7  inconsistent with his acquittal of assault charges, does not involve an unreasonable application

8  of clearly established federal law.  (Ans. Mem. at 49-54.)  Petitioner replies that a passive

9  display or inadvertent exposure of a weapon is insufficient to constitute "use" within the

10  meaning of the deadly weapon use enhancement.  (Traverse at 15-17.)

11      The Court will apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

12          The enhancement for personal use of a deadly or dangerous weapon applies
    when the defendant "personally uses a deadly or dangerous weapon in the
13          commission of a felony or attempted felony . . . ."  (Pen.Code, § 12022, subd.
    (b)(1).)  Weapon use requires something more than merely being armed or the
14          bare potential for use.  (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1007.)  The
    relevant inquiry is whether the defendant engaged in weapons-related *conduct*
15          with the intent to facilitate the crime.  (*People v. Granado* (1996) 49 Cal.App.4th
    317, 325, 329.)  If the defendant engaged in "no weapons-related conduct, or such
16          conduct was incidental and unrelated to the offense, no 'use' occurred . . . ."  (*Id.*
    at p. 325, fn. 7.)

17

18          However, the defendant need not engage in conduct that actually produces
    harm; it is sufficient if the defendant uses the weapon to aid in the commission of
19          the crime by creating *fear* of harm or force.  (*People v. Masbruch, supra*, 13
    Cal.4th at p. 1007; *People v. Wims* (1995) 10 Cal.4th 293, 302 (weapon use
20          established if defendant intentionally displays weapon in a menacing manner).)
    "(W)hen a defendant deliberately shows a (weapon), or otherwise makes its
21          presence known, and there is no evidence to suggest any purpose other than
    intimidating the victim (or others) so as to successfully complete the underlying
22          offense, the jury is entitled to find a facilitative use rather than an incidental or
    inadvertent exposure."  (*People v. Granado, supra*, 49 Cal.App.4th at p. 325
23          (defendant need not actually point gun or issue explicit threats to support use
    enhancement).)

24          A defendant can properly be found to have used a deadly weapon in the
    commission of the offense when the weapon is used during the defendant's *flight*
25          from the crime scene.  (*People v. Fierro* (1991) 1 Cal.4th 173, 225–227; *People
    v. Taylor* (1995) 32 Cal.App.4th 578, 580–583 (enhancement applied to firearm
26          use during escape from burglary, even though elements of burglary are complete
    upon entry); *People v. Granado, supra*, 49 Cal.App.4th at p. 329; see *People v.
27          Alvarado* (2001) 87 Cal.App.4th 178, 185, 187–191; *People v. Frausto* (2009) 180
    Cal.App.4th 890, 902–903.)  The only mental state requirement for the use
28          enhancement is the *defendant's intent* to use the weapon in furtherance of the

-34-

crime, and a use finding can be supported even if a victim was unaware of the weapon. (*People v. Granado, supra*, 49 Cal.App.4th at pp. 326–329.)

In reviewing a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) We presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Ibid.*) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*Ibid.*)

Defendant asserts he did not display the knife in a menacing manner in an effort to thwart the police and facilitate his escape, but rather he only incidentally held it in his hand while running away from the police. The jury was not required to reach this conclusion.

According to the police officers who found defendant in the office suite, defendant was running directly at them while holding the knife in his hand. Officer Ruiz (who saw the knife) thought defendant was going to fight with them in order to escape; Officer Jordan (who did not see the knife) thought defendant was going to collide with them; and defendant's conduct caused both officers to fear for their safety. Given the overall aggressive nature of defendant's conduct, the jury could reasonably conclude that he displayed the knife in a menacing manner to discourage attempts to apprehend him and to facilitate his flight from the scene of the burglary.

Defendant contends the forensic evidence presented at trial refuted the officers' testimony that defendant was running directly at them, and instead showed that he was running away from them. Contrary to defendant's claim, the forensic evidence was not definitive on this issue. For example, the doctor who conducted a forensic examination indicated that defendant's wounds could be consistent with different directions of travel, depending on such factors as how defendant was standing, whether he changed positions after the first shot was fired, and the movements of the shooter. Further, the doctor explained that the medical evidence alone was not conclusive as to what occurred and other information, including witness statements, was needed.

Moreover, even if defendant was running away from the officers, the jury could reasonably conclude that he was displaying the knife with the intent to instill fear and impede attempts to stop him as he fled the scene of the burglary. Regardless of which direction defendant was running, the record supports that he was acting in an aggressive manner and was not merely holding the knife in a benign manner as he tried to leave the scene.

Defendant's contention that the weapon use finding cannot be supported by facts relevant to the assault charges of which he was acquitted is unavailing. First, the jury's finding that he used a deadly weapon is not necessarily inconsistent with the jury's finding that he did not assault the officers. The jury could have concluded that he displayed the knife to instill fear so no one would try to stop him as he attempted to escape (thus establishing weapon use during the burglary), but that the facts did not otherwise establish assaultive conduct directed at the officers.

/ / /

1
2
3
4
5
6
7
8
9
10
11

Second, even if the verdicts are inconsistent, when evaluating a challenge to the sufficiency of the evidence, "each count must stand on its own, and a verdict on one has no bearing on any other." (*People v. Pahl* (1991) 226 Cal.App.3d 1651, 1657.) This principle is premised on the recognition that an inconsistent acquittal may be the product of mistake, compromise, or leniency, and the defendant should not be permitted to take further advantage of the result. (*Id.* at pp. 1656–1657; *People v. Lewis* (2001) 25 Cal.4th 610, 656.) "'Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. . . . This review should be independent of the jury's determination that evidence on another count was insufficient.'" (*People v. Palmer* (2001) 24 Cal.4th 856, 863.) Thus, the weapon use finding can properly be based on the assaultive nature of defendant's conduct even though defendant was acquitted of the assault charges.

To support his challenge to the jury's weapon use finding, defendant cites such evidentiary items as Officer Ruiz's testimony that defendant was not waving the knife over his head, and the fact that Officer Jordan (who was standing closer to defendant than Officer Ruiz) did not see the knife. Although these were relevant factors for the jury to consider, they do not defeat the evidentiary support for the weapon use finding.

12   (Lodgment No. 35, <u>People v. Garrett</u>, No. D062969, slip op. at 6-10.)

13   "[T]he Due Process Clause protects the accused against conviction except upon proof

14   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

15   charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  The Fourteenth Amendment's Due Process

16   Clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that

17   upon the record evidence adduced at the trial no rational trier of fact could have found proof of

18   guilt beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 (1979).  Federal

19   habeas courts must analyze <u>Jackson</u> claims "with explicit reference to the substantive elements

20   of the criminal offense as defined by state law." <u>Id.</u> at 324 n.16; <u>see also</u> <u>Bradshaw v. Richey</u>,

21   546 U.S. 74, 76 (2005) (holding that "a state court's interpretation of state law . . . binds a

22   federal court sitting in habeas corpus.")  The Court must "apply the standards of <u>Jackson</u> with

23   an additional layer of deference" when AEDPA applies, and can only grant relief if the state

24   court's decision was objectively unreasonable. <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir.

25   2005).  The Court must ask whether the appellate court decision "reflected an unreasonable

26   application of <u>Jackson</u> and <u>Winship</u> to the facts of this case." <u>Id.</u> at 1275.

27   / / /

28   / / /

As discussed below in Claim 5 where Petitioner contends defense counsel was ineffective for failing to object to the failure to define "menacing" in the jury instruction regarding the dangerous or deadly weapon use enhancement, the jury was instructed:

> Someone "personally" uses a dangerous or deadly weapon if he or she intentionally does . . . the following: Displays the weapon in a menacing manner.

(RT 1450; CT 206.)

The jury in this case was presented with sufficient evidence to draw a reasonable inference that Petitioner used knife in a menacing manner. Officer Ruiz testified that Petitioner came running out of the office toward the officers with the knife in his right hand, held waist high with his arm perpendicular to the ground, that he was not waiving the knife but running with it, and that the knife was lying next to his right hand after he was shot. (RT 662, 675, 691-92, 711.) Petitioner's own statements indicated that it was his intention to use the knife in a manner that would cause the officers to shoot him. In addition, blood spatter evidence, although not conclusive, suggested that Petitioner was moving toward the officers when he was shot.

Defense counsel argued that the fact that no blood was found on the knife indicated Petitioner had already dropped it when he was shot, and that the physical evidence and the testimony of the doctors and officers suggested that Petitioner was moving away from the officers and toward the exit when shot. Nevertheless, the jury was able to draw a reasonable conclusion that Petitioner held the knife in his hand, waist high parallel to the ground, while coming through the window and running in the direction of the officers, and that the knife therefore posed a threat to the officers, and was therefore used in a menacing manner. The Court must analyze this claim "with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16. California law provides that the jury may draw a reasonable inference that Petitioner was using the knife in a menacing manner if he was attempting to intimidate or threaten the officers. See e.g. People v. Granado, 49 Cal.App.4th 317, 325 (1996) (holding that when "there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent

exposure.  The defense may freely urge the jury not to draw such an inference, but a failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from [the statutory enhancement allegation].")  Although Petitioner contends his acquittal of assault is inconsistent with the jury finding that he used the knife in a menacing manner during the burglary, as the appellate court found, the jury could have found that he used the knife in the course of completing the burglary or effectuating his escape without having the intent to assault the officers, in that he was found in possession of items stolen from the office as he was exiting the office with the knife in his hand.  See Bradshaw, 546 U.S. at 76 (holding that "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus.") An evidentiary hearing is neither necessary nor warranted because the claim can be denied on the basis of the state court record, and Petitioner's allegations, even if true, do not provide a basis for habeas relief.  Campbell, 18 F.3d at 679;  Pinholster, 131 S.Ct. at 1398, 1401 n.10; Stokley, 659 F.3d at 808-09.

The Court finds that an evidentiary hearing is neither necessary nor warranted with respect to Claim 4, and that the state court adjudication of the claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The Court recommends habeas relief be denied as to Claim 4.

**E.    Claim 3**

Petitioner alleges in Claim 3 that even if the errors alleged in Claims 1, 2 and 4 were harmless in themselves, their cumulative effect infected his trial with unfairness to the point of causing a federal and state due process violation.  (Pet. at 8.)

Respondent answers that the state appellate court's denial of the claim, on the basis there were no errors to accumulate, is neither contrary to nor involves an unreasonable application of clearly established federal law.  (Ans. Mem. at 47-49.)  Respondent also contends that even if the admission of Petitioner's statements was error, Petitioner has not shown how they undermine the substantial evidence of his guilt, and any prejudice was minimized by the fact that O'Sullivan and Pardue provided essentially the same testimony as Burkett and Germain.  (Id. at 48.)

The Court will look through the silent denial of this claim by the state supreme court and apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

> Because we have not found multiple instances of error, defendant's claim that the cumulative effect of the errors requires reversal is unavailing.

(Lodgment No. 35, <u>People v. Garrett</u>, No. D062969, slip op. at 22.)

"The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007), citing <u>Chambers v. Mississippi</u>, 410 U.S. 284, 290 n.3 (1973). Even where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant." <u>United States v. Frederick</u>, 78 F.3d 1370, 1381 (9th Cir. 1996). Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." <u>Id.</u>, quoting <u>United States v. Wallace</u>, 848 F.2d 1464, 1476 (9th Cir. 1988). "Where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." <u>Frederick</u>, 78 F.3d at 1381.

As set forth above, the evidence against Petitioner was very strong on the charges for which he was convicted, receiving stolen property and burglary with the personal use of a knife. He was found in possession of property stolen from the office, and admitted to Detective Burkett that he had taken the camera. His attorney argued at every stage of the proceedings, including the preliminary hearing, at the close of the prosecution's case, to the jury, post-trial, and on appeal, that Petitioner had not used the knife within the meaning of the enhancement, but, as set forth above, the jury made that finding after being properly instructed on the law. Officer Ruiz testified that he saw the knife in Petitioner's hand in a ready position as he fired, and the knife was found outside the office lying next to Petitioner's hand after he had been shot. Thus, this is not a case where the evidence against Petitioner was weak, and even if there were errors which were harmless on their own, Petitioner has not shown that those errors accumulated to the point of denying him a fair trial or due process of law. An evidentiary hearing is neither necessary nor

1  warranted because the claim can be denied on the basis of the state court record, and Petitioner's

2  allegations, even if true, do not provide a basis for habeas relief.  Campbell, 18 F.3d at 679;

3  Pinholster, 131 S.Ct. at 1398, 1401 n.10; Stokley, 659 F.3d at 808-09.

4      The Court finds that an evidentiary hearing is neither necessary nor warranted with

5  respect to Claim 3, and that the state court adjudication of Claim 3 is neither contrary to, nor

6  involves an unreasonable application of, clearly established federal law, and is not based on an

7  unreasonable determination of the facts.  The Court recommends habeas relief be denied as to

8  Claim 3.

9  **F.    Claim 5**

10      Petitioner alleges in Claim 5 that he was denied his Sixth Amendment right to the

11  effective assistance of counsel by his trial counsel's failure to: (1) argue that he had been in the

12  process of throwing the knife back into the office when he was shot; (2) object that the weapon

13  use jury instruction failed to define menacing; (3) argue at sentencing that there had been a five-

14  year washout period rendering the prior convictions unusable; (4) introduce evidence of his

15  mental illness; (5) introduce evidence that the officers had made prior inconsistent statements

16  that he had not waived the knife at them; and (6) introduce evidence regarding the drugs in his

17  system at the hospital. (Pet. at 11.)  Respondent answers that Petitioner's allegations are vague

18  and conclusory, that he has not shown deficient performance or prejudice, and that the state

19  court's denial of these claims is neither contrary to nor involves an unreasonable application of

20  clearly established federal law.  (Ans. Mem. at 55-74.)

21      Petitioner presented this claim to the state supreme court in a petition for review of the

22  appellate court's denial of a habeas petition, which was summarily denied without a statement

23  of reasoning. (Lodgment Nos. 43-45.)  He also presented the claims to the appellate court in a

24  habeas petition. (Lodgment No. 33.)  The appellate court denied the petition, stating:

25      After resolving the issues raised by Garrett's appellate counsel in the appeal, the court has considered each of the additional arguments raised by petitioner in his *pro. per.* petition for writ of habeas corpus.  The contentions

26  raised by petitioner are either resolved in the appeal, or fail to state a prima facie

27  case for relief.  The petition is denied.

28  (Lodgment No. 36, In re Garrett, No. D064989, order at 1 (Cal.App.Ct. Feb. 21, 2014.)

Clearly established federal law provides that for ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things. First, he must show that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668, 687 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, he must show counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." Id. To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. Id. at 694. A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome." Id. Petitioner must establish both deficient performance and prejudice in order to establish constitutionally ineffective assistance of counsel. Id. at 687.

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "The standards created by Strickland and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." Richter, 131 S.Ct. at 788 (citations omitted). These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." Pinholster, 131 S.Ct. at 1398. Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction. Richter, 131 S.Ct. at 786, quoting Jackson, 443 U.S. at 332 n.5.

Petitioner first contends his trial counsel failed to argue that he had been in the process of throwing the knife back into the office when he was shot. (Pet. at 11.) Defense counsel argued that the most reasonable interpretation of the fact that there was no blood on the knife was that Petitioner had dropped it before he had been shot, but even if he was running with it in his hand, that would be insufficient to prove he was using it in a menacing way. (RT 1532-33, 1540.) Petitioner has not identified any evidence presented at trial which would have supported an argument that he was in the process of throwing the knife back into the office when he was shot. Rather, the evidence showed that he had the knife in his hand when he exited the office,

and the fact that the knife was found next to his hand, outside the office, after he had been shot, suggests that he was not in the process of throwing it back inside the office before he was shot. Furthermore, his own admissions indicate that he intended to use the knife to provoke the officers into shooting him, which would be inconsistent with his throwing the knife back inside the office as he ran through the window.  Thus, defense counsel presented an argument which was supported by the evidence, that Petitioner had dropped the knife before he was shot, and counsel risked losing credibility with the jury if he had argued a scenario, that Petitioner was in the process of throwing the knife back into the office when shot, which was not supported by, and was in fact contrary to, the evidence presented.  Petitioner has not alleged facts which, if true, show either deficient performance or prejudice in this respect.

Petitioner next argues that counsel failed to object to the jury instruction on the deadly weapon use allegation.  (Pet. at 11.)  The instruction as given, CALCRIM 3145, stated:

> Someone "personally" uses a dangerous or deadly weapon if he or she intentionally does . . . the following:  Displays the weapon in a menacing manner.

(RT 1450; CT 206.)

During the conference on jury instructions, the following exchange took place between the trial judge, the prosecutor, and defense counsel (Mr. Tandon), regarding the knife use allegation as it related to the assault charges:

The Court:    Okay, counsel.  The next instruction in order is 3145, "personal use of a deadly weapon."  This has been – this is specifically the 1192.7(c)(11) [assault on a peace officer] because I have another instruction that would address just subsection (23) [use during the burglary].

Prosecutor:   What I think might become an issue is what's the definition of "menacing manner."

Mr. Tandon:  That's what we were arguing.  That's what the instruction says.

The Court:    I don't think that there is any specific definition of "menacing manner."  I don't think it is a legal term unless you provide me with something that does indicate that it is a legal term that would not be known by the jurors.

Prosecutor:   Because I don't think that what is required is, for example, a brandishing in the assault.  What I don't think is required is that the knife be waved above one's head, for example, and so –

| | | |
|---|---|---|
| 1 | Mr. Tandon: | I think that what is required is something more than just holding it, and the prosecution can take the facts in this case and argue that what Mr. Garrett did was something more than just holding it and I can take the facts in this case and argue that it was not and the jury gets to make the decision. |
| 2 | | |
| 3 | | |
| 4 | Prosecutor: | Well, I mean, that's – part of my question is in this – in the type of situation where it is a knife and the assaultive conduct includes running at the victim, is more required for that to be menacing? Does there need to be some overt act with the hand and the knife? |
| 5 | | |
| 6 | | |
| 7 | The Court: | I'm not aware of that, counsel. |
| | Prosecutor: | I'm not aware of it either. |
| 8 | The Court: | It would be argument.  It would be up to you to argue to the jurors what is menacing or not. |
| 9 | | |
| 10 | Prosecutor: | And I think that's fine, but I think it is improper for there to be an argument that something more is required.  I think that's an improper argument because I don't think that is required. |
| 11 | | |
| 12 | Mr. Tandon: | I don't think that that's improper argument and that's why we have arguments. |
| 13 | | |
| | Prosecutor: | I guess I'll try to find something on what "menacing" means. |
| 14 | The Court: | Okay.  That's the instruction taken directly from CALCRIM with the modification that I've indicated that this is as relates to counts 1 and 2.  [¶]  Okay.  If you can give me a note that menacing requires any other elements, then I will consider that. |
| 15 | | |
| 16 | | |
| 17 | Prosecutor: | I actually don't think it requires any other elements.  That's my position. |
| 18 | The Court: | Right. |
| 19 | Prosecutor: | It appears that defense counsel's position is that menacing requires something else.  I don't have any case law to substantiate that position. |
| 20 | | |
| 21 | | |
| 22 | The Court: | And I think it's going to be common meaning of the word as know by the jurors.  Okay. |
| 23 | Mr. Tandon: | And just for the record, so we're clear on this, it's also not the defense's burden to prove what menacing is. |
| 24 | | |
| 25 | The Court: | The people have the burden of proof in this matter – all matters. |
| 26 | Prosecutor: | I agree that I have the burden of proof, but as far as whether or not I need to provide the burden of proof to substantiate defense counsel's argument on the definition, I don't think I have that burden. |
| 27 | | |
| 28 | (RT 1416-18.) | |

14cv1572

1    With respect to the knife use allegation in relation to the burglary charge, the parties

2   continued:

3   Mr. Tandon:  I think the problem that -- the prosecution seems to be positing a
                 theory that by having a weapon in your hand while escaping, that's
4                enough for personal use.  That is not the state of the law.  You have
                 to -- you have to display the weapon in a menacing manner in order
5                to be guilty of personal use.

6   The Court:   Or using it.

7   Prosecutor:  Well, I guess I differ, and I think that the law that I cited to the court
                 says otherwise.  It does not require the menacing manner.  It's the
8                use of the weapon when it's not yet – the defendant is not yet in a
                 place of safety.

9
    Mr. Tandon:  Holding a weapon.
10
    The Court:   He's using it.  But what we're doing is going back to the definition
11               in  12 – in 3145.  It does indicate "displays the weapon in a
                 menacing manner or using it."
12
    Mr. Tandon:  That's not "or."  It's – in order for it to be personally used, it has to
13               be displayed in a menacing manner.

14  The Court:   It's displayed or used.

15  Mr. Tandon:  Displayed or used in a menacing manner.  Someone personally uses
                 a dangerous or deadly weapon if he or she intentionally does any of
16               the following: displays the weapon in a menacing manner.  [¶]
                 That's what – that's the pinpoint instruction that CALCRIM has for
17               1192.7(c)(23). The prosecution can't allege it and not prove beyond
                 a reasonable doubt that he used it by displaying it in a menacing
18               manner.

19  Prosecutor:  But there's a bracketed section – not bracketed.  There's a careted
                 section there on the next page of the book that says, "if there's an
20               issue in the case as to whether the defendant used the weapon in the
                 commission of the offense, see the bench notes."
21
    The Court:   Okay.
22
    Mr. Tandon:  Correct.
23
    Prosecutor:  And then the bench notes point you to use another instruction.
24
    Mr. Tandon:  But it's – it's not is there a question did he use it?  It's is there a
25               question that he used it in the commission of the offense?  What it
                 then points to in terms of the burglary is that – that it happened
26               during the actual offense going on.  [¶]  That's when you get –
                 that's were it leads you to the escape language.  It's just letting you
27               know how long the crime is happening.  It's not redefining use.

28  / / /

14cv1572

| | | |
|---|---|---|
| 1 | The Court: | Right, right.  The 3261, in essence, is the definition that crimes such as burglary, robbery and receiving stolen property continue until he person has reached a – |
| 2 | | |
| 3 | Mr. Tandon: | The point of safety. |
| 4 | The Court: | -- point of safety. |
| 5 | Mr. Tandon: | And I understand that that's the state of the law.  As much as I would love to object to that particular instruction in this case, that's the state of the law.  I have to deal with that.  The prosecution has to deal with the state of the law as well, and they have to prove "menacing." |
| 6 | | |
| 7 | | |
| 8 | The Court: | And that is the definition as used in 3145 unless you have any other pinpoint instructions. |
| 9 | | |
| | Prosecutor: | I will. |
| 10 | | |
| | The Court: | Okay.  I'm going to add in Mr. -- Mr. Tandon, then, you – while you may not like it, you do realize that 3261 is the law that relates to burglary. |
| 11 | | |
| 12 | | |
| 13 | Mr. Tandon: | I will concede that it is the state of the law.  There is a pinpoint case cite in 3261 – and I'm sorry if I got the number wrong – that points out when the commission of the burglary is over. |
| 14 | | |
| | The Court: | Okay. |
| 15 | | |
| 16 | Mr. Tandon: | And it's when a person reaches a point of safety, and I think under the facts of this case, the prosecution may or may not be able to argue that he had not reached a point of safety yet. |
| 17 | | |
| | The Court: | Okay. |
| 18 | | |

19  (RT 1427-30.)

20       Petitioner has provided no basis for challenging defense counsel's argument regarding

21  the meaning of "menacing," and has identified no basis for a finding that had a definition of the

22  term been given to the jury the result would have been different.  Defense counsel argued to the

23  jury that Petitioner had not used the knife in a menacing manner because the fact that there was

24  no blood on the knife showed he dropped it before he was shot, and even if he was running with

25  it in his hand, it would be insufficient to prove he used it in a menacing way.  (RT 1532-33,

26  1540.)  That argument, and the jury instruction, were consistent with state law.  See e.g.

27  Granado, 49 Cal. App.4th at 325 (holding that when "there is no evidence to suggest any purpose

28  other than intimidating the victim (or others) so as to successfully complete the underlying

offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure. The defense may freely urge the jury not to draw such an inference, but a failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from [the statutory enhancement allegation].") Accordingly, Petitioner has not alleged facts which, if true, show either deficient performance or prejudice in this respect.

Petitioner next contends counsel failed to argue at sentencing that there had been a five-year washout period rendering the prior convictions unusable. (Pet. at 11.) Defense counsel indicated, immediately after the verdicts were returned and prior to the bench trial on the priors, that the main issue with the priors would be whether Petitioner had remained free of custody or the commission of another felony for five years after being released from custody on each of the four prior convictions. (RT 1804, 1808.) The trial judge explained to Petitioner that although he had a right to have the jury determine whether he was the person who had suffered the prior convictions, the judge would decide the legal issue regarding whether Petitioner had remained free of prison or the commission of a new felony for five years after being released from custody on each of the four charged prison priors. (RT 1806-07.) The prosecutor argued that the evidence presented at the bench trial demonstrated beyond a reasonable doubt that the five-year washout periods did not apply to the prior convictions, and the trial judge agreed. (RT 1870-73.) Petitioner's retained counsel at sentencing argued that he had been out of prison for more than five years prior to the instant offense. (RT 1892-94.) Thus, with respect to his allegation that his counsel was deficient in failing to argue for the application of a five-year washout period, Petitioner has not alleged facts which, if true, show either deficient performance or prejudice.

Petitioner alleges counsel failed to introduce evidence of his mental illness. (Pet. at 11.) However, Petitioner does not indicate how such evidence would have affected the outcome of the proceedings, other than with respect to the validity of his Miranda waiver. As discussed above with respect to Claim 1, such a contention is without merit, and any such error was harmless. In addition, his mental illness history was introduced by his counsel at sentencing. (CT 403-05, 431.) Petitioner has not alleged facts which, if true, show either deficient performance or prejudice in this respect.

Petitioner contends counsel failed to introduce evidence that the officers had made prior inconsistent statements that he had not waived the knife at them.  (Pet. at 11; Traverse at 28-30.)  Even if there are inconsistencies in the police reports and the officers' trial testimony, such as Officer Jordan's testimony that Officer Ruiz kicked the knife out of Petitioner's hand and Ruiz' testimony that he kicked the knife away from where it was lying next to Petitioner's hand, the officers were extensively cross-examined at trial by defense counsel regarding their actions during the shooting, all of which happened in a very short span of time in a very tight space.  In light of Petitioner's admission that he had the knife in his hand because he thought it would make it more likely that he would be shot, and defense counsel's argument that he was merely holding it and there was no blood on it, he has not shown that trial counsel's failure to introduce evidence regarding inconsistencies in the officers' observations as to whether Petitioner was waiving the knife or simply holding it was deficient or prejudicial.  Thus, Petitioner has not alleged facts which, if true, show either deficient performance or prejudice in this respect.

Finally, Petitioner alleges counsel failed to introduce evidence regarding the drugs in his system at the hospital.  (Pet. at 11.)  Defense counsel made a pre-trial motion to suppress the statements Petitioner made at the hospital, arguing that the police should have consulted with the doctors or nursing staff in order to determine what medication Petitioner had been administered, and whether Petitioner was, "medically able to engage in a voluntarily, freely given waiver of his constitutional rights." (RT 337.)  As set forth above, however, "the Supreme Court has never said that impairments from drugs, alcohol, or other similar substances can negatively impact the waiver." Budge, 577 F.3d at 1095 ("We have held that an intoxicated individual can give a knowing and voluntary waiver, so long as that waiver is given by his own free will.")  In any case, the state courts took into consideration Petitioner's medicated state, and found the waiver to be voluntary.  Petitioner has not alleged facts which, if true, show either deficient performance or prejudice in this respect.

Accordingly, the Court finds that Petitioner has failed to demonstrate he received constitutionally ineffective assistance of trial counsel in any respect.  See Richter, 131 S.Ct. at 791 ("Representation is constitutionally ineffective only if it 'so undermined the proper

functioning of the adversarial process' that the defendant was denied a fair trial."), quoting Strickland, 466 U.S. at 686.  An evidentiary hearing is neither necessary nor warranted because the claim can be denied on the basis of the state court record, and Petitioner's allegations, even if true, do not provide a basis for habeas relief.  Campbell, 18 F.3d at 679; Pinholster, 131 S.Ct. at 1398, 1401 n.10; Stokley, 659 F.3d at 808-09.

The Court finds that an evidentiary hearing is neither necessary nor warranted with respect to Claim 5, and that the state court adjudication of the claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  The Court recommends habeas relief be denied as to Claim 5.

## VI.

## CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying Petitioner's Motion for an Evidentiary Hearing (ECF No. 2), denying the Petition, and dismissing this action with prejudice.

**IT IS ORDERED** that no later than **January 23, 2015**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **February 6, 2015.**  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**DATED: December 29, 2014**

Peter C. Lewis
U.S. Magistrate Judge
United States District Court

14cv1572